1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10  PATRICK RAYE OWENS,

11              Petitioner,              No. CIV S-03-1377 GEB JFM P

12      vs.

13  CHERYL K. PLILER, Warden,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15  _____/

16          Petitioner is a state prisoner proceeding in propria persona with an application for

17  a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction

18  on charges of second degree murder, and the sentence of nineteen years to life in prison imposed

19  thereon on May 1, 1998.  Petitioner raises five claims in his petition, filed June 27, 2003, that his

20  prison sentence violates the Constitution.

21                          Procedural Background

22          On March 25, 1998, following a jury trial in San Joaquin County Superior Court,

23  petitioner was found guilty of second degree murder.  On May 1, 1998, petitioner was sentenced

24  to a term of nineteen years to life in state prison.  Petitioner filed a timely notice of appeal.  On

25  March 29, 2000, the California Court of Appeal for the Third Appellate District affirmed the

26  judgment, and the California Supreme Court denied review on June 14, 2000.

1

1         Petitioner sought collateral review in a series of state habeas petitions, beginning

2    with a petition filed in the trial court on September 20, 2001.  That petition was denied by order

3    filed May 16, 2002.  (Answer, Ex. H.)  On September 9, 2002, petitioner filed a second petition

4    in the California Court of Appeal, Third Appellate District.  That petition was denied on

5    September 12, 2002.  (Answer, Ex. J.)  On September 30, 2002, petitioner filed his third petition

6    in the California Supreme Court; that petition was denied on June 11, 2003, without comment.

7    (Answer, Ex. L.)

8         The federal habeas petition filed June 27, 2003, alleges five grounds for relief:

9         Ground one:  In violation of the Fourteenth Amend[ment,] trial
     court abused its discretion when it permitted the jury to visit crime
10   scene.

11        Ground two:  In violation of the Fourteenth Amendment, the trial
     court failed to give limiting instruction.
12
          Ground three:  Sixth Amendment violation of ineffective
13   assistance of counsel on limiting instruction(s).

14        Ground four:  Fourteenth Amendment violation of habeas corpus
     relief by the California Courts (on [ineffective assistance of
15   counsel]).

16        Ground five:  Sixth Amendment violation of ineffective
     assistance of trial counsel whom [sic] acted in "conflict of interest"
17   to:  (1) petitioner's actual innocence defense; (2) when trial
     Counsel refused/failed to present a "voluntary intoxication"
18   defense.

19   (Pet. at 5-7.)

20        On June 29, 2005, petitioner filed a petition for writ of habeas corpus in the

21   California Supreme Court in case number S135078.  On May 10, 2006, the California Supreme

22   Court denied the petition for writ of habeas corpus in case number S138078, citing "See *In re*

23   *Clark* (1993) 5 Cal.4th 750; *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Waltreus* (1965) 62

24   Cal.2d 218."  (Pet.'s Motion to Amend, Ex. H.)  On July 17, 2006, petitioner filed a motion to

25   amend the petition to include this late-exhausted claim.  On March 8, 2007, petitioner's motion

26   to amend the petition was denied.

FACTS[1]

Prosecution case in chief

On the night of March 28 and 29, 1997, security officers Leveston Warmsley, Robert Stucker and Manuel Flores were on duty at Elks Lodge No. 1016 in Stockton. At around midnight, Jerry Farley was standing up against a fence near Arroyo's Restaurant across the street from the lodge. Farley was holding a yellow tennis racket in his hand.

Flores heard "a loud noise, sounded like a firecracker, what appeared to be gunshot." Flores looked across the street and saw "a group of people gather there. And that is where that came from, that loud [sic] came from." Flores was unable to identify the shooter.

Warmsley saw two men approach Farley; one of them was [petitioner]. Warmsley heard a gunshot. He looked and saw that [petitioner's] "hand was coming down." Warmsley saw "something dark" in [petitioner's] hand. As Farley fell to the ground mortally wounded, [petitioner] and the other man fled from the area.

Stucker testified, "All of a sudden, I seen [sic] these three gentlemen walk up to [Farley]. One put his arm around this gentleman with the tennis racket. [¶] It looked like they hugged. And then all of a – I turned back around to draw my attention to the club. And for some reason, I looked back, and then all of a sudden I heard a shot ring off. And the gentleman with the tennis racket falls to the ground, and the other three gentlemen run [sic] off southbound on Center Street."[2]

Stucker identified [petitioner] as the shooter. He had seen [petitioner] earlier that night in the Elks Lodge parking lot, when he was sitting in a car drinking with another man. Stucker and Tim Wakeman, another security officer, had told [petitioner] and the other man that "they couldn't sit in the parking lot . . . . And they were very belligerent to us."

Ronnie Mitchell, [petitioner's] 18-year-old cousin, testified under a grant of immunity. Mitchell had been staying with [petitioner] for a couple of days prior to March 28, 1997. [Petitioner's] sister,

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Owens, No. C029841 (March 30, 2000), a copy of which is attached as Exhibit D to Respondent's Answer, filed February 23, 2004.

[2] After Farley was shot, Stucker pulled out his pistol and gave chase. The suspects ran south on Center Street and then east on Sonora Street.

Rene Owens, and Kevin Porter were also living with [petitioner] at the time.

On the night of March 28, 1997, [petitioner] drove Rene, Mitchell and Porter to the Elks Lodge. They arrived at around 10:30 or 11 p.m. Rene and Porter left the car and went inside. As [petitioner] and Mitchell were sitting in the car, a security guard told them they would have "to either go in or leave."

Mitchell testified that he and [petitioner] walked across the street to Arroyo's Restaurant. They stood outside drinking brandy. When they finished, [petitioner] went back to the Elks Lodge, Mitchell entered the restaurant and waited for [petitioner] to return.

[Petitioner] came back to the restaurant 35 to 45 minutes later. He stayed and talked to friends in the restaurant for 15 to 20 minutes. [Petitioner] and Mitchell left the restaurant and walked down the sidewalk a short distance. At the time, Farley was standing by the gate. [Petitioner] suggested that he and Mitchell take a walk around the block.

Mitchell described what happened next: "So I started walking. And we started walking around the corner, and I stopped. And I looked back to see what was taking him so long because he was walking real slow. [¶] He was walking towards my way, not the other guy's way. My way when I looked back. So I said come on, man, you know, like come on. [¶] Then I turned back around and started walking some more. And that is when I heard the gunshot. And I seen [sic] the light reflect off the wall. After the gunshot, I just took off running.

[Petitioner] and Mitchell ran into an alley and then back to the Elks Lodge. They reentered [petitioner's] car in the lodge parking lot.

Chris Sanders, a cousin of [petitioner] and Mitchell, was driving in the vicinity of the Elks Lodge at around midnight on March 29, 1997. He noticed emergency medical personnel attending to someone on the ground outside Arroyo's Restaurant. Sanders stopped to find out what was going on. A few minutes later, he saw [petitioner] and Mitchell coming out of the lodge parking lot in [petitioner's] car.

A police officer stopped the car and told [petitioner] he could not drive because he had been drinking. [Petitioner] asked Sanders to drive the car, and Sanders agreed. As Sanders drove, [petitioner] said, "oh, fuck, cuz." Sanders asked [petitioner] what was wrong; he did not respond. Mitchell told Sanders "it was an accident, it was an accident. Sanders did not know what Mitchell was talking about.

Later on the morning of March 29, 1997, [petitioner], Mitchell and Sanders were at home with Rene. Sanders asked Mitchell what had happened at the Elks Lodge. Mitchell "said he really don't [sic] know what is going on. He said all he know [sic] is that [petitioner] had walked up to [the] victim and shot him."[3] Sanders then asked [petitioner] if he shot the victim. At first [petitioner] made no comment; then he said no, he didn't do it; and finally he said "it wasn't cold-blooded."

Stockton Police Detectives Clifford Johnson and James Ballard investigated the murder. Detective Johnson interviewed [petitioner's] former girlfriend, Dawn Jean, who said that [petitioner] always had a weapon, and that she had last seen him with a weapon in the first part of March [1997]." Jean said the gun was "an old black revolver, possibly .38 caliber that he had gotten from someone else." At trial, Jean claimed that she had never seen [petitioner] with any firearm.

The detectives interviewed Rene before trial. She said she had received a telephone call from her mother, Juanita Owens, who told her that [petitioner] "had called [Juanita] in the middle of the night and told [Juanita] that he had been involved in a shooting and he thought he killed someone."[4] Rene also said that she had spoken to Mitchell, who told her that the victim had been "mean mugging" [petitioner] as he was walking by. In response, [petitioner] "pulled out a gun and shot the victim."[5]

Detective Johnson interviewed Kevin Porter, who related a conversation he had with Mitchell. Mitchell told Porter that "the victim walked by and that the [petitioner] just shot him."

When he was interviewed before trial, Mitchell told the detectives that, before getting out of the car, [petitioner] had pulled a black .38 caliber revolver with a black or brown grip out from under the car seat. [Petitioner] placed the gun in the waistband of his pants.

Mitchell told the detectives that, as he and [petitioner] passed by Farley, [petitioner] had "told him that the victim was looking at him crazy." Mitchell "told him not to worry about it. And no big deal and keep walking." Mitchell continued walking a short

---

[3] Mitchell denied making this statement. He claimed, basically I never told him nothing about [petitioner] shot nobody, [sic] nothing like that."

[4] At trial, Juanita denied receiving any such telephone call from [petitioner], and Rene denied making this statement to the detectives.

[5] Mitchell denied making this statement to Rene, and Rene denied telling Detective Johnson that Mitchell had made the statement to her.

distance before noticing that [petitioner] was no longer with him. Mitchell turned to see [petitioner] walking toward Farley. Mitchell saw [petitioner] "reach into his front waistband area, pull out the gun and point it directly at the victim's head." [Petitioner] then fired the gun at the victim's head, from a distance of one foot or less. Mitchell saw the victim fall. [Petitioner] and Mitchell took off running. [Petitioner] threw the gun away.

Defense

Vernon Whiteside testified that he saw Danae Ware, who was deceased at the time of trial, come out of Arroyo's and walk up to the man who was standing on the sidewalk. A moment later, Whiteside heard a "pow." Ware, carrying what looked like a gun, ran toward Whiteside, who ducked down.

Obed Pigg testified that he saw Ware standing in a group of men near Arroyo's Restaurant. As he watched the group, he saw Ware pull out a gun and shoot Farley.

Jeffrey Moore testified that while in the vicinity of the shooting, he heard a gunshot and saw a man come running toward him. The man had what appeared to be a gun in his hand. The man was not [petitioner].

[Petitioner] testified that he had witnessed a conversation between Farley, Mitchell and Ware. [Petitioner] called Mitchell away from the conversation because it was escalating into an argument. Mitchell approached [petitioner] but then returned to the argument. [Petitioner] tapped Mitchell on the shoulder and said, "let's go." He turned and started walking away. Then he heard a gunshot. He started running because he "didn't want to get hit."

(People v. name, slip op. at 2-8)

## ANALYSIS

### I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

/////

1          (2) resulted in a decision that was based on an unreasonable
2          determination of the facts in light of the evidence presented in the
        State court proceeding.

3  28 U.S.C. § 2254(d).

4         Under section 2254(d)(1), a state court decision is "contrary to" clearly

5  established United States Supreme Court precedents if it applies a rule that contradicts the

6  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9  (2000)).

10         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11  habeas court may grant the writ if the state court identifies the correct governing legal principle

12  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14  simply because that court concludes in its independent judgment that the relevant state-court

15  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

17  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

18  question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks

19  to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza,

20  297 F.3d 911, 918 (9th Cir. 2002).

21  II.  Petitioner's Claims

22      A.  First Claim

23         Petitioner's first claim is that the trial court abused its discretion when it permitted

24  the jury to visit crime scene, in violation of the Fourteenth Amendment.  Petitioner contends the

25  trial court should have denied the request outright or, in the alternative, arranged for a night-time

26  visit.  Petitioner argues that the crime scene visit "unfairly bolstered the prosecution's eyewitness

1    case in that it improperly rendered more credible the identification of petitioner by Robert

2    Stucker and Leveston Warmsley."  (Traverse at 5.)

3            The last reasoned rejection of this claim is the decision of the California Court of

4    Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

5    claim as follows:

6            Background

7                After commencing deliberations, the jury sent the trial court a
         note asking, "Can the jury be allowed, as a group, to visit the scene
8        of the crime?  To better determine the overall distances, layout, &
         lighting."

9
                 After discussing the request with counsel, the trial court
10       addressed the request as follows:  "One big problem with that is
         this, the testimony of the events that occurred was after midnight.
11       There is no way to go out now that we can duplicate the lighting of
         that. [¶]  In fact, what we would see would in no way replicate the
12       lighting at 12:00-something in the morning at that scene.  [¶]  So
         that is not a feasible thing unless we went out at 12:00-something
13       in the morning.  If later you decide, well, I still want to go out and
         see the layout and distance, we would set up a bus, try to set up
14       something to get you over there.  [¶]  But you would have to keep
         in mind that nothing would duplicate the lighting as you would see
15       it in the daylight that would reflect what any witness would have
         seen that night.  [¶]  We did have testimony from witnesses about
16       the lighting that night.  That is what the jury has as far as the
         evidence as to the lighting conditions.  That we cannot duplicate
17       going in the daylight."

18               Less than an hour after sending the first note, the jury sent a note
         requesting to visit the scene "to better visualize the distances."
19       The foreperson wrote that the jury understands the "lighting would
         not be representative." [Petitioner] waived his right to be present
20       when the jury visited the crime scene.  The trial court instructed the
         jurors that, at 9:00 the next morning, the bailiff would take them to
21       the scene, two blocks from the courthouse.  Jurors could look at the
         scene but could not talk to anyone at the scene or to each other.
22       When they returned to the jury room, they could then discuss what
         they had seen.

23       Analysis

24               Section 1119 provides in relevant part:  "When, in the opinion of
25       the court, it is proper that the jury should view the place in which
         the offense is charged to have been committed, . . . it may order the
26       jury to be conducted in a body, . . . to the place, . . ., which must be

                                            8

1   shown to them by a person appointed by the court for that purpose;
    and the officer must be sworn to suffer no person to speak or
2   communicate with the jury, nor to do so himself or herself, on any
    subject connected with the trial, and to return them into court
3   without unnecessary delay, or at a specified time."

4       "The standard of review for a trial court's decision to grant or
    deny a request for a jury view is abuse of discretion."  *(People v.*
5   *Price* (1991) 1 Cal.4th 324, 422; *People v. Keltie* (1983) 148
    Cal.App.3d 773, 782.)  *Price* and *Keltie* held that, where the crime
6   scene lighting cannot be replicated, the trial court has discretion to
    deny the request for a jury view.  (*Price, supra,* at p. 422; Keltie,
7   supra, at pp. 782-783.)  Contrary to [petitioner's] argument, neither
    case suggests the court has *no* discretion to *grant* a jury view
8   where, as here, the jury is made aware of the inevitable differences
    in lighting but nevertheless believes an examination of the crime
9   scene would be helpful to the resolution of other issues.

10      [Petitioner] counters that, on the facts of this case, there was "no
    way the viewing of the scene during the day could assist the jury
11  even, assuming *arguendo,* the jurors limited their consideration of
    the scene to distances."  He effectively claims the trial court should
12  have second-guessed the jury's conclusion that a "better
    visualiz[ation of] the distances" would be helpful.  However,
13  nothing on this record gave the trial court a basis to reject the jury's
    conclusion.

14
        [Petitioner's] claim of prejudice is similarly unpersuasive.  He
15  argues the jury visit made the security guards' eyewitness
    identifications of him more believable because the crucial
16  impediment to their observations, the darkness of the midnight
    hour, was absent.  This argument presumes the jury disregarded the
17  trial court's admonition to "keep in mind that nothing would
    duplicate the lighting . . . that would reflect what any witness
18  would have seen that night."  We presume the jury followed the
    admonition.  (*E.g., People v. Erickson* (1997) 57 Cal.App.4th
19  1391, 1403.)

20      In any event, [petitioner's] identification as the killer was not
    dependent on the testimony of the security guards, but was
21  confirmed by Mitchell's statements to the detectives, by Rene's
    description of her telephone conversation with her mother, and by
22  Porter's account of his conversation with Mitchell.  The jury's visit
    to the crime scene could not have been prejudicial.  (*People v.*
23  *Watson* (1956) 46 Cal.3d 818, 836.)

24  (People v. Owens, slip op. at 8-11.)

25      The only question before this court is whether the trial court committed an error

26  that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process.

1  Id.  See also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us,

2  always, is whether the state proceedings satisfied due process; the presence or absence of a state

3  law violation is largely beside the point").  For purposes of AEDPA, petitioner must demonstrate

4  that the California courts' rejection of his federal due process claim was contrary to or an

5  unreasonable application of "clearly established Federal law, as determined by the Supreme

6  Court of the United States."  28 U.S.C. § 2254(d)(1);  Lockyer v. Andrade, 538 U.S. 63, 70-71

7  (2003).

8          In this claim, petitioner cites no Supreme Court authority or other federal

9  authority supporting his theory that the trial court abused its discretion by allowing the jury to

10  visit the crime scene, other than a passing reference to the Fourteenth Amendment.[6]  As noted by

11  the state court, California law invests discretion with the trial judge as to whether or not a jury

12  will be allowed to visit the crime scene.  Federal habeas courts lack jurisdiction to review state

13  court applications of state procedural rules.  See Estelle v. McGuire, 502 U.S. 62, 67-68

14  (1991)("it is not the province of a federal habeas court to reexamine state-court determinations

15  on state-law questions.")  Petitioner may not "transform a state law issue into a federal one

16  merely by asserting a violation of due process."  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir.

17  1996), cert. denied, 522 U.S. 881 (1979).

18  /////

19  /////

20  ――――――――――――――――

21      [6]  In his traverse, petitioner cites authority for his view that the state court's finding that
petitioner being identified as the killer wasn't dependent on the testimony of the security guards

22  was an unreasonable application of controlling federal precedent.  See Neil v. Biggers, 409 U.S.
188, 200 (1972); Manson v. Brathwaite, 432 U.S. 98, 114-115 (1977); and Tomlin v. Myers, 30

23  F.3d 1235, 1241 (9th Cir. 1994).  (Traverse at 5, n.2.)  Petitioner argues that witnesses Mitchell,
Rene and Porter testified they did not make statements identifying petitioner to the detectives

24  who testified that these witnesses did, in fact, make such statements.  However, these differences
in testimony were credibility questions for the jury.  While petitioner appears to believe the crime

25  scene visit swayed the jury to believe the testimony of the security guards over defense witnesses,
it is also possible that the jury credited the detectives' testimony over the testimony of Mitchell,

26  Rene and Porter.  Moreover, the three cases cited by petitioner all address the reliability of
identification testimony, a claim petitioner has not directly raised in the instant petition.

But even if this claim were cognizable on habeas review, it would fail.  Petitioner is correct that the initial jury request to view the crime scene indicated they wanted to "better determine . . . lighting."  (CT 396.)  However, the trial judge was quick to correct the jury:

> One big problem with that is this, the testimony of the events that occurred was after midnight.  There is no way to go out now that we can duplicate the lighting of that.  [¶]  In fact, what we would see would in no way replicate the lighting at 12:00-something in the morning at that scene.  [¶]  So that is not a feasible thing unless we went out at 12:00-something in the morning.  If later you decide, well, I still want to go out and see the layout and distance, we would set up a bus, try to set up something to get you over there.
>
> But you would have to keep in mind that nothing would duplicate the lighting as you would see it in the daylight that would reflect what any witness would have seen that night.  [¶]  We did have testimony from witnesses about the lighting that night.  That is what the jury has as far as the evidence as to the lighting conditions.  That we cannot duplicate going in the daylight.

(RT 1385-86.)

Later, the jury submitted further questions, and stated they would "[s]till like to visit scene to better visualize the distances.  Understand lighting would not be representative."  (CT 394.)  The jury was summoned and the trial judge instructed them as follows:

> It is very important that you understand something, it is absolutely important, that is, you are going to be nothing but a camera tomorrow.  [¶]  That is, you can look at the scene.  You cannot talk with anyone at the scene.  No matter who it might be about anything connected with the scene.  [¶]  Two, you cannot talk among yourselves about the scene.  The only time you can talk about anything about that scene is when you're back here in the jury room and the door is shut and you're deliberating.  [¶]  So that means, say you're out at the scene and one of you says that is what he talked about or this is where he is or isn't this, you ask him different questions about is that what you understand this to be or is that what you think it is, that would be improper and impermissible.
>
> So all he can do is take you over there and he will take you in from Arroyo's – from one end of the Elks Club to the other for that.  [¶]  And then you will be able to see the street that abuts at the bottom right angle, Sonora, I think it is.  And you will see Lafayette at the top.  That you will see.  [¶]  But remember, and

1
2
3

> this is most important, again, is that you cannot talk among yourselves there.  You cannot do any deliberating there in any shape, form or fashion.  Each one does his or her own looks.  Okay.  When you get back, then you can discuss what you saw and what you feel its impact on the evidence that you heard.

4  (RT 1390-91.)

5       Here, the trial court considered the jury's request, properly instructed the jury

6  concerning the fact that a day visit would not illustrate the crime scene because the crime

7  occurred around midnight, then carefully instructed the jurors that they could not speak to anyone

8  at the crime scene or to each other until they returned to the jury room to deliberate.  Petitioner

9  declined the opportunity to accompany the jurors to the crime scene.[7]  (RT 1387.)

10       The trial court was careful to instruct the jury that the lighting could not be

11  decided by their visit to the crime scene but only by the witnesses' testimony about the lighting

12  on the night in question.  See Jamison v. Grier, 2002 WL 100642 at *17  (S.D. N.Y.)(admission

13  of photos of crime scene taken in daylight where crime occurred at midnight, was not an abuse of

14  discretion, an error of state law or an error of constitutional magnitude,  because jury was

15  informed of difference in lighting conditions and during defense summation, and New York law

16  provided that the issue goes to the weight, not the admissibility of such photographs.)  The jury is

17  presumed to follow the trial court's admonitions.  Penry v. Johnson, 532 U.S. 782, 799 (2001).

18       In addition, in the instant case, the jury foreman noted in writing that the jury

19  understood the "lighting would not be representative."  The record reflects that the crime scene

20  visit would assist the jury in terms of layout and distance.  There is no reason to believe that the

21  jury would not be able to distinguish the differences between lighting and the concepts of layout

22  and distance.

23  /////

24

25       [7]  Petitioner's presence was not required.  See Snyder v. Massachusetts, 291 U.S. 97 (1934) (defendant "gains nothing" by presence at jury view of murder scene where he is prohibited from speaking to the "showers" of the scene, providing suggestions and giving advice)

26  overruled on other grounds, Malloy v. Hogan, 378 U.S. 1 (1964).

On this record, the court cannot find that the trial court's decision to allow the jury to view the crime scene rendered petitioner's trial fundamentally unfair. Petitioner has failed to demonstrate how allowing the jury to visit the crime scene violated his constitutional rights or that the state court's rejection of this claim was contrary to or an unreasonable application of binding Supreme Court authority. Accordingly, petitioner's first claim for relief should be denied.

B.  Second Claim

Petitioner's second claim is that the trial court failed to give a limiting instruction, in violation of the Fourteenth Amendment. Petitioner contends the trial court had a *sua sponte* duty to instruct the jury that a prior felony conviction admitted to impeach may not be used to prove petitioner's predisposition to commit the crime. Specifically, petitioner argues that CALJIC No. 2.23 was deficient because it did not specify that the jury may not use prior crimes as propensity evidence against a criminal defendant.

The state court rejected this claim as follows:

On cross-examination, [petitioner] admitted he had been convicted of "a felony involving moral turpitude" in November 1995, and had been "convicted of a crime involving moral turpitude, a felony," in 1997.[8]

The trial court instructed the jury with CALJIC No. 2.23 as follows: "The fact that a witness has been convicted of a felony if this is a fact, may be considered by you only for the purpose of determining believability or credibility of that witness. [¶] The fact of a conviction does not necessarily destroy or impair a witness' believability or credibility. [¶] It is one of the circumstances that you may take into consideration in weighing the testimony of that witness." [Clerk's Transcript 433.]

By its terms, CALJIC No. 2.23 told the jury that a prior felony conviction may be considered "*only* for the purpose of determining believability or credibility. . . ." (Italics added.) This language prohibited the jury from using the evidence for *any* other purpose, including proof of [petitioner's] predisposition or propensity to

---

[8]  The probation report identifies the 1995 offense as accessory to felony (§ 32), and the 1997 offense as possession of a firearm by a convicted felon (§ 12021, subd. (a)(1)).

1   commit murder.  The jury is presumed to have followed this
    instruction.  (*People v. Hardy* (1992) 2 Cal.4th 86, 208.)  "If
2   [petitioner] believed that the instruction was incomplete or needed
    elaboration, it was his responsibility to request an additional or
3   clarifying instruction.  (*People v. Bell* (1989) 49 Cal.3d 502, 550.)

4       In *People v. Brown* (1993) 17 Cal.App.4th 1389, on which
    [petitioner] relies, evidence of proof of uncharged child
5   molestations was introduced at the defendant's trial for child
    molestation.  The jury was instructed that it could consider the
6   prior acts in determining "[t]he believability of a witness and the
    weight to be given the testimony of each witness." (*Id.* at p. 1397,
7   internal quotations marks omitted.)  The reviewing court ruled that
    "[t]his ambiguous language could invite a jury to consider a
8   defendant's propensity to commit a crime; *e.g.,* the jury could
    interpret the language to mean they could consider the evidence
9   presented as to the other molestations as tending to show *Brown*
    was a child molester and therefore his denial of molesting J. was
10  less believable." (*Id.* at pp. 1397-1398.)

11      Here, in contrast, the prior convictions were sanitized and there
    was no suggestion that [petitioner] had previously been convicted
12  of murder.  That left no reasonable basis to speculate that
    [petitioner] has a propensity to commit murder and "therefore his
13  denial of [murdering Farley] was less believable." (*Brown, supra,*
    17 Cal.App.4th at p. 1398.)  It is not reasonably likely that the jury
14  understood its instruction in the manner suggested by [petitioner].
    (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

15

16  (*People v. Owens*, slip op. at 11-13.)

17      A challenge to jury instructions does not generally state a federal constitutional

18  claim.  *See* Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021

19  (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

20  1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or

21  application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805,

22  814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a

23  "claim of error based upon a right not specifically guaranteed by the Constitution may

24  nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire

25  trial that the resulting conviction violates the defendant's right to due process."  Hines v.

26  Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

1   1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236

2   (1941).  To prevail, petitioner must demonstrate that the instructional error "'so infected the

3   entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62,

4   72 (1991) (quoting Cupp, 414 U.S. at 147).  Petitioner's burden is "especially heavy" when the

5   court fails to give an instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

6          After review of the record herein, this court finds that the failure to modify

7   CALJIC 2.23 to specifically preclude the jury from considering petitioner's prior felony

8   conviction as propensity evidence was not error.  Pursuant to CALJIC No. 2.23, the jury was told

9   that it could "only" consider the prior convictions on the issue of petitioner's credibility.  The jury

10  is presumed to have followed these instructions.  Penry v. Johnson, 532 U.S. 782, 799 (2001).

11  The trial court instructed the jury using CALJIC 2.23 to ensure that the jury only considered

12  petitioner's criminal record for judging petitioner's credibility or believability.  There were no

13  facts suggesting petitioner's criminal record should be used to demonstrate his guilt to the instant

14  charges, and no evidence of uncharged prior acts were admitted in this case.  The state court of

15  appeal's rejection of this claim was neither contrary to, nor an unreasonable application of

16  applicable principles of federal law.  Petitioner's second claim for relief should be denied.

17          C.  Third Claim

18          Petitioner's third claim is that he sustained ineffective assistance of counsel

19  because trial counsel failed to seek a limiting instruction concerning petitioner's criminal record,

20  in violation of the Sixth Amendment.

21          The state appellate court rejected this claim, stating:

22          [The court has] already determined that it is not reasonably likely
            that the jury understood CALJIC No. 2.23 to permit consideration
23          of propensity evidence.  (Clair, supra, 2 Cal.4th at p. 663; see part
            II, ante.)  It is not reasonably probable that a clarifying instruction
24          would have produced a different result.

25  (People v. Owens, slip op. at 14.)

26  /////

15

1      The Sixth Amendment guarantees the effective assistance of counsel.  To

2 establish that trial counsel's representation failed to meet Sixth Amendment standards, petitioner

3 must show (1) counsel's performance fell below an objective standard of reasonableness, and (2)

4 prejudice.  Strickland v. Washington, 466 U.S. 668 (1984).  Trial counsel has a duty "to make

5 reasonable investigations or to make a reasonable decision that makes particular investigations

6 unnecessary."  Id. at 691.  There is a strong presumption that counsel's conduct falls within the

7 wide range of reasonable professional assistance, or what "'might be considered sound trial

8 strategy.'"  Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

9      Petitioner was entitled to CALJIC 2.23 to ensure the jury only considered his

10 criminal record in the context of assessing his credibility.  The jury was instructed with CALJIC

11 2.23.  There are no facts or evidence admitted in this case that suggests the jury would

12 understand CALJIC 2.23 to mean they could use the fact of petitioner's prior conviction to find

13 petitioner guilty of the instant charges.  Indeed, a careful reading of CALJIC 2.23 demonstrates

14 otherwise.  (See section C.)  Thus, trial counsel cannot be found ineffective for failing to request

15 a further limiting instruction.

16      The state court's rejection of petitioner's third claim for relief was neither contrary

17 to, nor an unreasonable application of, controlling principles of United States Supreme Court

18 precedent.  Petitioner's third claim for relief should be denied.

19    D.  Fourth Claim

20      Petitioner's fourth claim is that his Fourteenth Amendment rights were violated

21 by the San Joaquin County Superior Court's denial of his petition for habeas corpus relief.

22 Specifically, petitioner contends that when the San Joaquin County Superior Court denied

23 petitioner's request for habeas corpus relief, his right to effective assistance of counsel under the

24 due process and equal protection clauses were violated.  This claim is not cognizable in this

25 federal habeas corpus proceeding.  See, e.g., Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989)

26 (alleged errors in state post-conviction review proceeding do not form the basis for claims

1  cognizable in federal habeas corpus proceedings).  Accordingly, petitioner's fourth claim for

2  relief should be denied.

3      E.  Fifth Claim

4          Petitioner's fifth claim is that "ineffective assistance of trial counsel whom [sic]

5  acted in 'conflict of interest'[9] to:  (1) petitioner's actual innocence defense; (2) when trial

6  Counsel refused/failed to present a 'voluntary intoxication' defense."  (Pet. at 7.)  In his points

7  and authorities, petitioner specifically alleges trial counsel was ineffective based on failure to:

8  (1) present testimony; (2) object to prosecution's misstatement; (3) suppress unreliable

9  identification; (4) timely turn over defense witness statements; (5) suppress two statements made

10  in violation of Miranda,[10] (6) failure to present voluntary intoxication defense; and (7) failure to

11  investigate.

12          The last reasoned state court decision addressing the ineffective assistance of

13  counsel claims was rendered by the San Joaquin County Superior Court when it denied

14  petitioner's habeas petition on May 16, 2002.  (Answer, Ex. H at 1-4.)  The Superior Court

15  rejected all of petitioner's ineffective assistance of counsel claims.  (Id.)

16          The Sixth Amendment guarantees the effective assistance of counsel.  The United

17  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

18  Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

19  counsel, a petitioner must first show that, considering all the circumstances, counsel's

20

21          [9]  Petitioner uses the phrase "conflict of interest" in almost every ineffective assistance of
22  counsel claim asserted about trial counsel.  However, it appears petitioner misapprehends the
   definition of the terms "conflict of interest."  Conflict of interest is defined as "[t]erm used in
23  connection with . . . fiduciaries and their relationship to matters of private interest or gain to
   them."  Black's Law Dictionary 271 (5th ed. 1979).  Nothing in the record demonstrates trial
24  counsel engaged in behavior that resulted in private interest or gain to her.

25          [10]  In Miranda v. Arizona, the United States Supreme Court held that custodial
   interrogation must be preceded by advice to the potential defendant that he has the right to
26  consult with a lawyer, the right to remain silent and that anything he says can be used in evidence
   against him.  384 U.S. 436, 469-73 (1966).

1   performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

2   identifies the acts or omissions that are alleged not to have been the result of reasonable

3   professional judgment, the court must determine whether, in light of all the circumstances, the

4   identified acts or omissions were outside the wide range of professionally, competent assistance.

5   Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

6   counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

7   range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

8   Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

9   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

10  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

11          Second, a petitioner must establish that he was prejudiced by counsel's deficient

12  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

13  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

14  been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

15  confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

16  F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

17  performance was deficient before examining the prejudice suffered by the defendant as a result of

18  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

19  lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

20  955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

21          1.  Failure to Present Testimony

22          Petitioner contends trial counsel's failure to call certain witnesses as defense

23  witnesses was error.  The Superior Court found that petitioner failed to make a prima facie

24  showing of ineffective representation with respect to any of the witnesses petitioner argues trial

25  counsel should have questioned concerning petitioner's actual innocence.  (Answer, Ex. H at 1.)

26  /////

1   Petitioner contends Ronnie Mitchell changed his testimony to identify petitioner

2   as the shooter because Mitchell was afraid of being prosecuted as an accessory to the crime, not

3   because he was now telling the truth.  (Pet., Attachment j.)  The Superior Court addressed this

4   claim as follows:

5       Mitchell was subject to cross-examination by the defense and
        denied much of the damaging statements the prosecution claimed
6       he made.  The petition fails to show that recalling Mitchell as a
        defense witness would have resulted in evidence more favorable to
7       petitioner.

8   (Answer, Ex. H at 2.)

9   Here, petitioner has not provided a declaration from Mitchell or any other

10  evidence supporting his theory that calling Mitchell as a defense witness would have elicited

11  more favorable evidence.  Moreover, in light of the other testimony identifying petitioner as the

12  shooter, petitioner has failed to demonstrate how calling Mitchell as a defense witness would

13  have changed the outcome.  This claim must fail.

14  Petitioner contends that trial counsel was ineffective because counsel failed to call

15  Rita Renee Owens as a defense witness.  Petitioner argues that Ms. Owens was pressured to

16  make false statements implicating petitioner in the murder.  (Pet., Attachment l.)

17  The Superior Court rejected this claim as follows:

18      Owens, who was not present at the shooting, was called by the
        prosecution and subject to cross-examination.  She denied telling
19      the detectives investigating the killing that petitioner's mother told
        her petitioner admitted involvement in the shooting and denied
20      telling detectives Mitchell told her petitioner shot the victim.
        Again, the petition fails to show that recalling Owens as a defense
21      witness would have resulted in evidence more favorable to
        petitioner.
22

23  (Answer, Ex. H at 2.)

24  Petitioner has again failed to present a declaration from Owens or any other

25  evidence supporting this theory.  Owens was not present during the shooting and, given the

26  /////

testimony of other witnesses, petitioner has failed to demonstrate how additional testimony from

Owens would have changed the outcome of this case.  This claim must also fail.

With regard to witness Kevin Porter, petitioner contends Detective Johnson

testified falsely as to statements Kevin Porter made.  (Pet., attachment n.)

The Superior Court rejected this claim as follows:

> Detective Johnson testified Porter told him petitioner confessed
> to the shooting while giving Porter a ride home from work the day
> after the shooting.  Porter was called by the prosecution, denied
> making any such statement to the detective, denied receiving any
> confession from petitioner, and denied riding home with
> petition[er] on that day after the shooting.  Porter testified that he
> did ride to work with petitioner that morning, but rode home with a
> co-worker.  [¶]  Petitioner also contends his attorney provided
> ineffective assistance in failing to call the co-worker.

> The petition fails to show that recalling Porter as a defense
> witness would have resulted in evidence more favorable to
> petitioner.  While the co-worker might have been able to
> corroborate that Porter rode home with him, rather than petitioner,
> there is no showing the co-worker could recall which day Porter
> rode with him.  Furthermore, the jury could have believed Porter
> was simply confused as to when he rode with petitioner and heard
> his admissions.

(Answer, Ex. H at 2.)

Petitioner has not provided a declaration from Porter or any other evidence

supporting his theory, and has failed to show how additional testimony from Porter would have

changed the outcome in light of other witnesses' testimony identifying petitioner as the shooter.

Petitioner's claim as to the failure of trial counsel to call co-worker Kenneth Johnson fails for the

same reasons.

### 2.  Failure to Object to Prosecution's Misstatement

Petitioner contends he suffered ineffective assistance of counsel because trial

counsel failed to object when the prosecution stated petitioner was holding a gun when witness

Flores testified he did not see petitioner holding a gun.  (Pet., Attachment x-y.)  However, it

appears the prosecution used the word "gun" to establish directions and details of what Mr.

1  Flores witnessed.  (RT 459-60.)  Even if the prosecution's use of the word "gun" was in error,

2  petitioner has not demonstrated how the outcome of the trial would have been different had trial

3  counsel objected to the prosecution's use of this term.  At most, the trial court would have

4  stricken the questions and the prosecution would have rephrased them.  This claim should also be

5  denied.

6                    3.  Failure to Demonstrate Unreliable Identification

7            Security guards were on duty on the night in question.  Petitioner contends trial

8  counsel failed to adequately demonstrate that the guards' identification of petitioner as the

9  shooter was unreliable and failed to suppress the identifications on that ground.  (Pet.,

10  Attachment s-x.)

11            The Superior Court rejected this claim as follows:

12        The petition fails to show that the initial photo line-up
     identifications of petitioner were unduly suggestive and

13       unnecessary.  Therefore the identification of petitioner in court was
     not unduly suggestive.  Having failed to establish the first part of

14       the reliability test, petitioner has no basis upon which to argue the
     identifications should have been suppressed.

15

16  (Answer, Ex. H at 3.)

17            An attorney's failure to make a meritless objection or motion does not constitute

18  ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing

19  Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).  See also Rupe v. Wood, 93 F.3d 1434,

20  1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

21  "To show prejudice under Strickland resulting from the failure to file a motion, a defendant must

22  show that (1) had his counsel filed the motion, it is reasonable that the trial court would have

23  granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would

24  have been an outcome more favorable to him."  Wilson v. Henry, 185 F.3d 986, 990 (9th Cir.

25  1999) (citing Kimmelman, 477 U.S. at 373-74) (so stating with respect to failure to file a motion

26  to suppress on Fourth Amendment grounds)).  See also Van Tran v. Lindsey, 212 F.3d 1143,

1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's failure to pursue a motion

to suppress the lineup identification), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Lockyer v. Andrade</u>, 538

U.S. 63 (2003); <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253 (9th Cir. 1996) (trial counsel is not

ineffective in failing to file a suppression motion "which would have been 'meritless on the facts

and the law'"); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression

motion not ineffective assistance where counsel investigated filing the motion and there was no

reasonable possibility that the evidence would have been suppressed); <u>United States v. Molina</u>,

934 F.2d 1440, 1447 (9th Cir. 1991) (counsel did not render ineffective assistance by failing to

file a motion to suppress that was "clearly lacking in merit").

   "When analyzing lineup claims, a reviewing court must determine if the

procedures in question were 'unnecessarily suggestive.'" <u>Van Tran</u>, 212 F.3d at 1156 (quoting

<u>Biggers</u>, 409 U.S. at 198).  Even if the procedures are suggestive, the resulting evidence is only

to be excluded if it is not reliable.  <u>Biggers</u>, 409 U.S. at 199-200; <u>Van Tran</u>, 212 F.3d at 1156 ;

<u>United States v. Duran-Orozco</u>, 192 F.3d 1277, 1282 (9th Cir. 1999).  If the flaws in the pretrial

identification procedures are not so suggestive as to violate due process, "the reliability of

properly admitted eyewitness identification, like the credibility of the other parts of the

prosecution's case is a matter for the jury." <u>Foster v. California</u>, 394 U.S. 440, 443 n.2 (1969).

<u>See</u> <u>also</u> <u>Manson v. Brathwaite</u> 432 U.S. 98, 116 (1977) ("[j]uries are not so susceptible that they

cannot measure intelligently the weight of identification testimony that has some questionable

feature").  On the other hand, if an out-of-court identification is inadmissible due to

unconstitutionality, an in-court identification is also inadmissible unless the government

establishes that it is reliable by introducing "clear and convincing evidence that the in-court

identifications were based upon observations of the suspect other than the lineup identification."

<u>United States v. Wade</u>, 388 U.S. 218, 240 (1967).  <u>See</u> <u>also</u> <u>United States v. Hamilton</u>, 469 F.2d

880, 883 (9th Cir. 1972) (in-court identification admissible, notwithstanding inherent

suggestiveness, where it was obviously reliable).  Factors indicating the reliability of an

1    identification include: (1) the opportunity to view the criminal at the time of the crime; (2) the

2    witness's degree of attention (including any police training); (3) the accuracy of the prior

3    description; (4) the witness's level of certainty at the confrontation; and (5) the length of time

4    between the crime and the identification.  Manson, 432 U.S. at 114 (citing Biggers, 409 U.S. at

5    199-200)).  The "central question" is "whether under the 'totality of the circumstances' the

6    identification is reliable even though the confrontation procedure was suggestive."  Biggers, 409

7    U.S. at 199.

8              Here, petitioner did not challenge Mr. Stucker's initial photo line-up identification

9    of petitioner.  Rather, petitioner argues Mr. Stucker failed to tell police he could identify

10   petitioner as the shooter when Mr. Stucker was interviewed at the scene of the crime, and that

11   pieces of Mr. Stucker's trial testimony were not true when compared to other trial testimony.

12   (Pet., Attachment s-t.)  Petitioner's arguments do not rise to the level of a constitutional violation

13   in this context.  Any variances in testimony are issues of credibility for the jury to decide.

14   Moreover, Mr. Stucker was the most credible eyewitness because he saw petitioner in a car in the

15   Elks Lodge parking lot earlier that night, prior to seeing petitioner shoot the victim.  (RT 363-

16   65.)

17             Petitioner also challenges security guard Warmsley's testimony.  Petitioner

18   contends Mr. Warmsley testified it was too dark to see, that Mr. Warmsley didn't see a gun in

19   petitioner's hand, and notes Mr. Warmsley's recollection of the night of the crime was weak.

20   (Pet., Attachment v.)  Petitioner goes on to point out other variances in Mr. Warmsley's

21   testimony.  Petitioner appears to argue that Mr. Warmsley's statement that he was "told when he

22   was shown the picture – to identify it as petitioner" (RT 237) demonstrates that someone

23   prompted Mr. Warmsley to pick petitioner's photo out of the lineup.  (Pet., Attachment v.)

24             The record reflects the following.  Although witness Warmsley did not see a gun

25   in petitioner's hand, he heard the gunshot and saw petitioner's hand drop.  (RT 230-32.)  The

26   lighting was bright enough to see petitioner.  (RT 235.)  Mr. Warmsley identified petitioner from

23

a photo line-up.  (RT 237.)  On cross-examination, Mr. Warmsley testified that he informed the

police officer that the photo Mr. Warmsley picked from the photo line-up looked like the

perpetrator.  (RT 243.)  While Mr. Warmsley did state that he was "told when he was shown the

picture – to identify it as petitioner," (RT 237), petitioner uses that statement out of context.

Reading Mr. Warmsley's statement in context demonstrates that Mr. Warmsley picked

petitioner's photo out of the lineup:

> Q.  Did you point to a photo and say that looks like the person?
>
> A.  Yeah.

(RT 237-38.)

> Q.  What did the officer say to you, if anything?
>
> A.  What?  About the pictures?
>
> Q.  Yes.
>
> A.  He said we are going to bring some photos of the suspect to see
> if you know him.  Can you pick out somebody.
>
> Q.  Okay.  So the officer told you that they had a suspect and they
> wanted to show you a photograph?
>
> A.  No.  Just they want to show pictures to point somebody out.

(RT 239-40.)

> The officer had a book of photographs, showing Mr. Warmsley one photo at a

time.  (RT 241.)

> Although Mr. Warmsley admitted he did not tell the officer he was one hundred

percent sure the person identified was the perpetrator, and admitted he wasn't absolutely sure it

was that person, Mr. Warmsley stated he stopped looking at the photos once he saw and

identified petitioner's photo as the perpetrator.  (RT 243-44.)  When pressed for the reason why

he stopped looking at photos, Mr. Warmsley responded, "Why should I keep looking if I think

that person is it?"  (RT 244.)  When asked if he told the officers that he wanted to see petitioner

/////

1   in person for an identification, Mr. Warmsley stated, "No.  Because I know sooner or later I

2   would have seen him in person anyway to come to be a witness."  (RT 243.)

3           This record does not reflect that the photo line-up was unduly suggestive or that

4   the reliability of Mr. Warmsley's identification of petitioner was suspect.  Because petitioner has

5   failed to demonstrate that the identification of petitioner was unreliable, there were no grounds

6   upon which trial counsel could have moved to suppress the identification.  Moreover, even if

7   petitioner had demonstrated such unreliability as to Mr. Warmsley, petitioner has not

8   demonstrated that the outcome of this case would have been different had Mr. Warmsley not

9   identified petitioner.  This claim must also fail.

10          Petitioner also argues that because all of the above witnesses did not physically

11  identify petitioner at the time of the crime when they were interviewed by the police, it was dark

12  during the crime, and they witnessed petitioner for only a brief period of time immediately after

13  the gunshot, trial counsel was ineffective for failing to challenge the pretrial or trial identification

14  of petitioner as the perpetrator.

15          However, pursuant to California law, an extrajudicial identification violates a

16  defendant's right to due process only if the identification procedure was unduly suggestive and

17  unnecessary, and the identification itself, under the totality of the circumstances, was unreliable.

18  People v. Carpenter, 15 Cal. 4th 312, 366-367 (1997).  Petitioner has the burden of showing the

19  identification procedure was unfair "as a demonstrable reality, not just speculation."  People v.

20  DeSantis, 2 Cal. 4th 1198, 1222 (1992).  See also People v. Ochoa, 19 Cal. 4th 353, 412 (1998).

21  If the challenged procedure is not impermissibly suggestive, the reviewing court's inquiry into the

22  due process claim ends.  Ochoa, 19 Cal. 4th at 412; DeSantis, 2 Cal. 4th at 1224 n.8.  As one

23  California court has stated,

24          The issue of constitutional reliability depends on (1) whether the
            identification procedure was unduly suggestive and unnecessary
25          (Manson v. Brathwaite [(1977)] 432 U.S. [98,] 104-107 . . .; and if
            so, (2) whether the identification itself was nevertheless reliable
26          under the totality of the circumstances, taking into account such

                                        25

1   factors as the opportunity of the witness to view the criminal at the
    time of the crime, the witness's degree of attention, the accuracy of
2   [her] prior description of the criminal, the level of certainty
    demonstrated at the confrontation, and the time between the crime
3   and the confrontation (id. at pp. 109-114 . . .). If, and only if, the
    answer to the first question is yes and the answer to the second is
4   no, is the identification constitutionally unreliable.

5   DeSantis, 2 Cal. 4th at 1222.

6          Generally, a pretrial identification procedure is deemed unfair only if it suggests

7   the identity of the person suspected by the police before the witness has made an identification.

8   People v. Brandon, 32 Cal. App. 4th 1033, 1052 (1995).  The crucial question under California

9   law is whether the defendant was singled out from the others in such a way that his identification

10  was a foregone conclusion under the circumstances.  People v. Faulkner, 28 Cal. App. 3d 384,

11  391 (1972) disapproved on other grounds in People v. Hall, 28 Cal. 3d 143, 156, n.8 (1980) and

12  People v. Bustamonte, 30 Cal.3d 88, 102 (1981).

13         As noted above, petitioner has not demonstrated that the photo lineup was unduly

14  suggestive or unreliable.  Moreover, the fact that more than one witness identified petitioner as

15  the perpetrator means that petitioner cannot meet the prejudice prong of Strickland.  This claim

16  should also be denied.

17              4.  Failure to Timely Turn Over Defense Witness Statements

18         Petitioner contends that trial counsel failed to timely turn over defense witness

19  statements to the prosecution, resulting in a three month delay in petitioner's trial.  (Pet.,

20  attachment hh.)  Petitioner argues that defense counsel was not required to request the

21  continuance to allow the prosecution to investigate the gang connections, if any, of witnesses

22  Obed Pigg and Vernon Whiteside, whose statements were turned over to the prosecution during

23  jury selection.  (Id.)  These potential witnesses were to testify that someone else committed the

24  murder.  Petitioner avers that trial counsel "knew there was no gang affiliation."  (Id.)

25  /////

26  /////

1   The Superior Court rejected this claim, noting the witnesses were permitted to

2   testify for the defense and finding petitioner failed to demonstrate "any prejudice by his counsel's

3   slow response to the discovery order."  (Answer, Ex. H, at 3.)

4   A review of the proceedings surrounding the prosecution's late receipt of the

5   witness statements reveals that trial counsel had no choice but to request a continuance.  (RT

6   132-49.)  Trial counsel explained:

7       [G]ang evidence is so potentially incriminating or prejudice to my
client that I may need time to, if the Court were to allow the
8   rebuttal, to investigate what evidence is it that [the prosecution]
would present.  [¶]  So it is not – I am not really asking for a
9   continuance just to delay my opening statement, but rather because
of what Mr. Puckett anticipates that he will find, what evidence he
10   will find, what witnesses, et cetera.  [¶]  And needing to re-
interview the two witnesses again and maybe interview other
11   witnesses to rebut his rebuttal.  So I think I see it as not just a
problem with my opening, but a problem generally with the case.
12   That is why I was asking for the continuance.

13   (RT 142.)

14   The record reflects that trial counsel had difficulty receiving the witness

15   statements herself.  (RT 134.)  Given the nature of the proposed testimony of Mr. Pigg and Mr.

16   Whiteside, trial counsel would have been ineffective had she *not* insisted on investigating

17   whatever evidence the prosecution uncovered.  The record reflects that trial counsel was

18   reasonable in requesting a continuance.  Moreover, petitioner has again failed to demonstrate

19   how going to trial three months earlier would have changed the outcome of this case, failing the

20   prejudice prong of Strickland.

21   5.  Failure to Suppress Statements Obtained in Violation of Miranda

22   Petitioner contends he suffered ineffective assistance of counsel because trial

23   counsel failed to argue in court that petitioner had invoked his Miranda rights during police

24   questioning on May 28, 1997 and June 2, 1997.  (Pet., Attachment ii.)  Rather, trial counsel

25   elected to argue that "since petitioner had been assigned an attorney on May 30, 1997 (on the

26   probation violation arrest) that the detectives shouldn't have spoken to or interrogated petitioner

1   "on the suspected March 28/29, 1997 murder of Jerry Farley."  (Id.)  The prosecution then

2   pointed out that no charges were formally filed until after both interviews of petitioner by police

3   and the trial court ruled that the statements could be used for impeachment purposes only.  (Id.)

4   However, petitioner notes that the trial court stated that "it would be a different proposition if

5   petitioner had 'invoked his right to counsel rather than the right to advisement to Miranda.'"  (Id.,

6   citing RT 67).  Petitioner argues that this was the point trial counsel should have been arguing,

7   because petitioner had invoked counsel at the beginning of each interrogation.  (Pet., Attachment

8   ll.)

9          The Superior Court rejected this claim:

10         Petitioner's statements were not used in the prosecution's case-in-
           chief, but to impeach petitioner's testimony.

11
           Petitioner's contentions are without merit.  Statements taken after a
12         suspect has invoked a right to counsel may be used for
           impeachment purposes, even if a police officer purposefully fails to
13         honor the suspect's invocation of the right to counsel, if statements
           are otherwise voluntary.  People v. Peevy (1998) 17 Cal.4th 1184
14         [cert. denied, Peevy v. California, 525 U.S. 1042 (1998)].

15  (Answer, Ex. H, at 4.)

16         Trial counsel challenged the admission of petitioner's statements made to police

17  on May 28, 1997 and June 2, 1997 in a written motion in limine filed November 17, 1997, and

18  again on February 23, 1998.  (CT 282; 344.)  Trial counsel brought out the fact that she had

19  moved to exclude these statements under Miranda and that they should not come in even for

20  impeachment.  (RT 66-67.)  However, trial counsel withdrew her Miranda challenges based on

21  California law.  (RT 89.)  Trial counsel stated:

22         [The prosecution] isn't going to introduce [petitioner's statements]
           except for impeachment purposes.  [¶] My reading of the case law,
23         unfortunately that is allowed even if you have them by violation,
           recent case law does allow the prosecution to still introduce the
24         statements.

25  (RT 89.)  The trial court confirmed that the statements would be used for impeachment purposes

26  only.  (RT 89.)

1    A statement, taken in violation of Miranda, may not be used substantively in the

2  prosecution's case-in-chief.  However, such a statement, if voluntary, may be used for

3  impeachment should the defendant testify inconsistently.  See Harris v. New York, 401 U.S. 222,

4  224-26 (1971).  "If a defendant exercises his right to testify on his own behalf, he assumes a

5  reciprocal 'obligation to speak truthfully and accurately.' "  Michigan v. Harvey, 494 U.S. 344,

6  351 (1990) (quoting Harris, 401 U.S. at 225).  The Supreme Court has consistently rejected

7  arguments that would allow a defendant to "turn the illegal method by which evidence in the

8  Government's possession was obtained to his own advantage, and provide himself with a shield

9  against contradiction of his untruths."  Id. (quoting Harris, 401 U.S. at 224).  However, if the

10  statement was procured such that it was involuntary, then the statement is excluded for all

11  purposes.  Michigan v. Harvey, 494 U.S. 344, 351 (1990); Henry v. Kernan, 197 F.3d 1021, 1029

12  (9th Cir.1999).

13    Petitioner has made no effort to demonstrate the statements were involuntary.

14  Rather, petitioner focuses on facts supporting his claim that the statements were made in

15  violation of his Miranda rights.  But as trial counsel noted in withdrawing her Miranda

16  challenges, statements may be used for impeachment purposes, even if made in violation of

17  Miranda.  If a defendant gives a statement after receiving Miranda warnings, and that statement is

18  arguably inconsistent with his trial court testimony, the prosecutor may inquire into the prior

19  inconsistent statements during cross-examination of the defendant.  See Anderson v. Charles,

20  447 U.S. 404, 408-09 (1980).

21    After a review of the state court record, this court concludes that petitioner's trial

22  counsel did not render ineffective assistance in failing to pursue Miranda challenges to

23  petitioner's statements.  Because the statements were admitted for impeachment purposes only,

24  any motion to suppress these statements would have been futile.  This court concludes that trial

25  counsel's performance was within the wide range of professionally competent assistance.  This

26  claim should also be denied.

1        6.  Failure to Pursue Voluntary Intoxication Defense

2        Petitioner clarified this claim in his traverse.  Petitioner argues that because

3  counsel failed to present third party evidence demonstrating that Danae Ware was the actual

4  shooter, trial counsel should have at least presented evidence of petitioner's voluntary

5  intoxication.  (Traverse at 24-26.)

6        Where the state court reaches a decision on the merits but provides no reasoning

7  to support its conclusion, a federal habeas court independently reviews the record to determine

8  whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d

9  848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear

10  that a state court has not reached the merits of a petitioner's claim, or has denied the claim on

11  procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court

12  must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v.

13  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

14        Petitioner's trial counsel presented a defense that petitioner didn't shoot the

15  victim, arguing that the prosecution failed to meet its burden of proof beyond a reasonable doubt.

16  Trial counsel also argued that if the jury found petitioner had shot the victim, it was only

17  involuntary manslaughter.  The record in this case discloses a reasonable strategic explanation for

18  counsel's decision to choose this defense.  Most importantly, it was supported by petitioner's

19  trial testimony.  As discussed by the state appellate court and confirmed by the state court record,

20  petitioner recalled the relevant events in detail and unequivocally denied he was the shooter.  Mr.

21  Pigg testified that Danae Ware was the shooter.  Although Mr. Whiteside did not see the actual

22  shooting, he saw Danae Ware walk up to the man who was standing on the sidewalk and, after

23  hearing the gunshot, saw Ware, carrying what looked like a gun, run toward Whiteside.

24        It was reasonable for counsel to rely on petitioner's testimony to establish the

25  defense.  See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be

26  determined or substantially influenced by the defendant's own statements or actions"); Turk v.

1   White, 116 F.3d 1264, 1267 (9th Cir. 1997) ("when the facts that support a certain potential line

2   of defense are generally known to counsel because of what the defendant has said, the need for

3   further investigation may be considerably diminished or eliminated altogether").  Cf. Sanders, 21

4   F.3d at 1456 (nothing in the record, apart from incompetence, suggested "even a colorable

5   explanation" for counsel's decision not to interview critical information from a key exculpatory

6   witness).[11]  As noted above, the additional testimony of the witnesses petitioner suggests trial

7   counsel should have called to establish petitioner's defense do not demonstrate the testimony

8   would have resulted in evidence more favorable to petitioner.

9          To the extent petitioner is arguing that counsel should have presented both a

10   "voluntary intoxication" defense and an "actual innocence" defense, his claim must be denied.

11   Such defenses would be incongruent.  It appears counsel made a strategic tactical decision, after

12   assessing the state of the trial evidence, to proceed solely with the defense that petitioner did not

13   commit the crime and dispense with any other defenses counsel may have prepared for or that

14   may have been available.

15          Petitioner also cannot demonstrate prejudice on this claim.  Petitioner was charged

16   with murder, defined as "the unlawful killing of a human being, or a fetus, with malice

17   aforethought."  Cal. Penal Code § 187, subd. (a).  Manslaughter is defined as an intentional and

18   unlawful killing by one who lacks malice.  Cal. Penal Code § 192.  "Evidence of voluntary

19   intoxication is admissible solely on the issue of whether or not the defendant actually formed a

20   required specific intent, premeditated, deliberated, or harbored malice aforethought, when a

21   specific intent crime is charged."  Cal. Penal Code § 22, subd. (b).  "Although voluntary

22   intoxication may at times amount to unconsciousness, it cannot give a complete defense . . .; it

23   can only negate specific intent under section 22."  People v. Walker, 14 Cal.App.4th 1615, 1621

24   (1993).

25

26       [11]  Danae Ware was dead at the time of petitioner's trial.

1        Moreover, the record reflects evidence was admitted demonstrating petitioner had

2   been drinking on the night of the murder.  Various witnesses testified that petitioner had been

3   drinking that night.[12]  In fact, petitioner was not allowed to drive home because he had been

4   drinking; he asked his cousin to drive him home.

5        Petitioner has failed to show that the verdict would have been different had

6   counsel chosen a different defense, or introduced additional testimony supporting a voluntary

7   intoxication defense, failing to meet the prejudice prong of <u>Strickland</u>.  Accordingly, petitioner is

8   not entitled to relief on this claim.

9        7.  Failure to Investigate

10        Finally, in some of the above claims, petitioner alleges trial counsel failed to

11   investigate third party evidence that Danae Ware was the actual shooter and also failed to present

12   third party evidence that Danae Ware was the actual shooter, thus failing to properly pursue

13   plaintiff's actual innocence defense.  However, a review of the record reflects that trial counsel

14   sought a continuance so she could do further investigation into the statements of Mr. Pigg and

15   Mr. Whiteside and perform follow-up investigation on whatever discovery the prosecution

16   provided with regard to those statements.  Both Mr. Pigg and Mr. Whiteside testified at

17   petitioner's trial, casting doubt on whether petitioner was the actual shooter.  In closing

18   argument, trial counsel reminded the jury that "there is a lot of evidence that is consistent with

19   Danae Ware being the shooter, and that is something that you have to consider.  [¶]  That

20   evidence creates reasonable doubt to the prosecution's case."  (RT 1317.)

21

22       [12]  For example, Detective Clifford Johnson testified that Ronnie Mitchell told him that
    Mitchell and petitioner had been drinking a bottle of brandy in front of Arroyo's on the night in

23   question.  (RT 774.)  Kevin Porter denied telling Detective Johnson that petitioner told Kevin
    that petitioner had blacked out on the night of the murder.  (RT 655.)  Detective Johnson stated

24   that Mr. Mitchell told him that petitioner appeared "tipsy" that night; that Mr. Mitchell and
    petitioner had been drinking earlier at the home prior to going to the Elks Club.  (RT 791.)

25   Kevin Porter testified he got petitioner a drink in the Elks Club.  (RT 651.)  Detective Johnson
    testified that Dawn Jean, petitioner's ex-girlfriend, told the detective that petitioner gets drunk

26   easily and that he becomes violent and stupid when he drinks alcohol.  (RT 453-54.)

1    Defense counsel has a "duty to make reasonable investigations or to make a

2    reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at

3    691.

4    Petitioner's vague claims in this regard are insufficient to establish prejudice.  He

5    has failed to demonstrate how further investigation would have changed the outcome of this case.

6    <u>See</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance

7    claim denied where he presented no evidence concerning what counsel would have found had he

8    investigated further, or what lengthier preparation would have accomplished).  Petitioner failed

9    to provide any declarations or other evidence that trial counsel should have discovered through

10   investigation.

11   In addition, contrary to petitioner's claim, counsel did put on a defense.  Trial

12   counsel argued that petitioner did not shoot the victim.  Petitioner testified on his own behalf and

13   called at least two witnesses whose testimony suggested Danae Ware was the shooter, not

14   petitioner.  In closing argument, trial counsel pointed out the numerous discrepancies in the

15   witnesses' testimony.  (RT 1301-26.)  Trial counsel argued the prosecution failed to meet its

16   burden by arguing that there was "uncertainty among the prosecution's witnesses [and] [t]here

17   [was] uncertainty among the defense witnesses."  (RT 1328.)

18   Petitioner has failed to explain how a different defense would have resulted in a

19   better outcome.  In this regard, the court notes petitioner was acquitted of first degree murder.

20   Petitioner has failed to show that counsel's failure to pursue further investigation rendered the

21   result of the trial unreliable or the proceeding fundamentally unfair.  Accordingly, these claims

22   should also be denied.

23   For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's

24   application for a writ of habeas corpus be denied.

25   These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 1, 2007.



UNITED STATES MAGISTRATE JUDGE

001; owen1377.157